**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0328n.06
Filed: May 9, 2006

No. 05-3750

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KAREN STEPHENS, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| KETTERING ADVENTIST | ) | |
| HEALTHCARE, d/b/a Kettering | ) | |
| Medical Center Network, | ) | **O P I N I O N** |
| | ) | |
| **Defendant-Appellee.** | ) | |
| _____) | | |

Before: MOORE and GIBBONS, Circuit Judges; SHADUR,[*] District Judge.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Karen Stephens ("Stephens") sued her former employer, Defendant-Appellee Kettering Adventist Healthcare, d/b/a Kettering Medical Center Network ("Kettering"), for allegedly terminating her in violation of the federal Age Discrimination in Employment Act ("ADEA") and Ohio law. The district court granted summary judgment to Kettering because Stephens produced insufficient evidence that Kettering's proffered reason for firing her was pretextual rather than legitimate and nondiscriminatory. Because we agree that Stephens did not raise a genuine issue of material fact with respect to pretext, we **AFFIRM** the district court's order granting summary judgment to Kettering.

---

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

# I. BACKGROUND

Kettering, which operates a number of health care facilities in Dayton, Ohio, employed Stephens as a registered nurse in the special care nursery of the maternity unit at Southview Hospital. Beginning in October 2001, Stephens was supervised by Janet Gibson ("Gibson"), a charge nurse in the maternity unit. Gibson described Stephens's performance prior to the events leading up to this case as "[f]ine" and noted that Stephens was skilled in handling emergency situations. Joint Appendix ("J.A.") at 79 (Gibson Dep. at 16).

In October 2002, Gibson received complaints from other nurses in the maternity unit about Stephens's treatment of infants. Sandy Ewald ("Ewald") said that Stephens had held infants' noses and force-fed infants. According to Gibson, Ewald said this conduct "had been going on for awhile," which Gibson understood to mean "[m]onths, maybe even longer." J.A. at 82 (Gibson Dep. at 30-31). Nicole Dibble ("Dibble") reported similar conduct by Stephens. Brenda Schwartz ("Schwartz") said that Stephens had held an infant's nose in order to make the infant eat. The infant "went dusky,"[1] and Stephens blew in the infant's face to get it to breathe.[2] J.A. at 84 (Gibson Dep. at 38). Bobbie Moon ("Moon") also indicated that she had seen Stephens mistreat an infant.

Gibson relayed these reports to her clinical manager, Jeanette Hall ("Hall"), who in turn informed Monique Kakhonen ("Kakhonen"), a human resources manager. Kakhonen, Hall, and Pam Stout ("Stout"), the maternity unit's acting director, investigated the allegations against Stephens

---

[1]"Dusky" apparently refers to an infant's complexion when it does not receive enough oxygen. *See* J.A. at 95 (Gibson Letter) (indicating that Schwartz had "witnessed [Stephens] force feed an infant causing it to turn dusky [and] then blow in its face to help it to pink up. (Raise oxygent sat.)").

[2]Schwartz later recanted part of her allegation, claiming that she had not seen the infant turn dusky.

by interviewing and receiving statements from nurses in the maternity unit. The notes prepared during the investigation indicate that six nurses — Ewald, Dibble, Schwartz, Moon, Jill Durnell, and Pam Long — had witnessed Stephens engaging in a variety of questionable behavior with infants: being rough, pinching shut the nostrils in order to force-feed, yelling, spanking, blowing into faces, and shaking. The reports of Dibble and Ewald included the names of the infants and the approximate dates of the alleged incidents. The other reports did not include such specifics.

In the midst of the investigation, Kakhonen and Hall met with Stephens to inform her of the allegations. Stephens denied them but stated that she did apply pressure to infants' jaws in order to force them to suck from feeding bottles. She also stated that similar complaints had been made two years earlier but that no action had been taken. Stephens was given the opportunity to name coworkers who would vouch for her. Of the six people Stephens named, two — Ewald and Schwartz — had already made allegations against her.[3] The investigation continued after the meeting with Stephens.

At the close of the investigation, Kakhonen, Hall, and Stout decided to discharge Stephens based on the allegations of misconduct. After Stephens was discharged, two part-time nurses, Dibble and Andi Richardson ("Richardson"), were promoted to full-time positions. At the time of discharge, Stephens was sixty years old, while Dibble and Richardson were in their twenties and thirties, respectively.

Stephens filed suit, bringing claims under the ADEA and Ohio's common-law tort of wrongful discharge in violation of public policy. Kettering moved for summary judgment on two

---

[3]Two others — Andi Richardson and Joanna Adams — stated that they had heard of Stephens's conduct from other employees but had not witnessed it themselves.

3

grounds: (1) Stephens had not established a prima facie case of discrimination because she was not "replaced" under the relevant legal standard, and (2) even assuming a prima facie showing of discrimination, Stephens had not established that Kettering's reason for discharging her was a pretext for discrimination. The district court assumed that Stephens had established a prima facie case but held that she had produced no evidence of pretext. Thus, the district court granted summary judgment to Kettering on both claims. Stephens now appeals.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006). Summary judgment is "rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmovant. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, we must view the facts and the inferences drawn therefrom in the light most favorable to the nonmovant. *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004).

### B. ADEA Claim

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Subject to certain exceptions not relevant here, this protection applies "to individuals who are at least 40 years of age." *Id.* § 631(a). "An employee may establish a claim under the ADEA by offering either direct or circumstantial evidence of age

4

discrimination."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  Where, as here, an employee's age-discrimination claim is based on circumstantial rather than direct evidence, we apply the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510 (6th Cir. 2004); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("[W]e shall assume, *arguendo*, that the *McDonnell Douglas* framework is fully applicable [in ADEA actions].").

"*McDonnell Douglas* and subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'" *Reeves*, 530 U.S. at 142 (omission in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).  This framework proceeds in three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).  "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

As did the district court, we assume for present purposes that Stephens has established a prima facie case of age discrimination and proceed to the next steps of the *McDonnell Douglas* burden-shifting framework. Kettering claims that Stephens was discharged because of her alleged mistreatment of infants in the maternity unit. Mistreating or otherwise endangering patients is a legitimate, nondiscriminatory basis for an adverse employment action against a medical caregiver under antidiscrimination law. *See, e.g.*, *Brohm v. JH Props., Inc.*, 149 F.3d 517, 522 (6th Cir. 1998); *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 336, 342 (5th Cir. 2002), *cert. denied*, 537 U.S. 1108 (2003); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 804, 807 (7th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000). Stephens does not dispute that Kettering has met its burden with respect to the second *McDonnell Douglas* step. As a result, the case turns on the third step: whether Stephens can prove that the legitimate, nondiscriminatory reason offered by Kettering is a pretext for discrimination.

"This circuit has recognized three primary routes to proving pretext: the plaintiff may show 'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge.'" *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n.10). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

6

Stephens's principal pretext argument is that Kettering did not conduct an adequate investigation into the mistreatment allegations before making its decision to discharge her, as it did not learn the specifics (i.e., dates, times, identities of the infants) of some of the alleged incidents. Yet "we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). An investigation is sufficient if the employer "reasonabl[y] reli[ed] on the particularized facts that were before it at the time the decision was made." *Id.* Upon receiving the first reports that Stephens had mistreated infants, Kettering investigated the allegations by interviewing other nurses. Kettering gave Stephens the opportunity to respond to the charges and to suggest coworkers who would vouch for her. At the completion of the investigation, Kettering had reports from six nurses that Stephens had mistreated infants. Stephens denied the allegations, but she offered no evidence undermining the veracity of the nurses' reports. Based on these circumstances, we conclude that Kettering "reasonabl[y] rel[ied] on . . . particularized facts" in making a "reasonably informed and considered decision."

Stephens next contends that pretext is evidenced by Kettering's alleged failure to discipline the other nurses for failing promptly to report her alleged mistreatment. This is essentially a claim that Kettering treated Stephens differently from her similarly situated colleagues. What Stephens fails to appreciate is that such an argument requires "disparate treatment for the *same conduct*." *Weigel*, 302 F.3d at 378 (emphasis added). Stephens's alleged *mistreatment of infants* is not the same conduct as the other nurses' alleged *failure promptly to report mistreatment of infants*.

Therefore, even if it were true that the other nurses violated hospital policy and should have been disciplined, Kettering's failure to do so would not establish pretext.

Finally, Stephens asserts that "[t]he concerns . . . regarding suspicious shortcomings in the hospital's investigation are similar to those recently addressed by the Supreme Court" in *Reeves*. Appellant Br. at 8-9. Unfortunately, she fails to elaborate precisely what similarities she sees between *Reeves* and the instant case. In any event, a critical difference is readily apparent: Reeves offered considerable proof of pretext in the form of evidence suggesting that he did not commit the workplace violations for which he was supposedly discharged, *Reeves*, 530 U.S. at 144-45, but Stephens has offered no evidence to indicate that she did not mistreat the infants.

In sum, Stephens has failed to put forth any evidence that Kettering's legitimate, nondiscriminatory reason for discharging her — the allegations of patient mistreatment — was a pretext for age discrimination. Thus, we affirm the grant of summary judgment to Kettering on the ADEA claim.

## C. State-Law Claim

Ohio law recognizes a cause of action for wrongful discharge in violation of public policy on the basis of age discrimination. *See Livingston v. Hillside Rehab. Hosp.*, 680 N.E.2d 1220 (Ohio 1997); *Gessner v. City of Union*, 823 N.E.2d 1, 5 (Ohio Ct. App. 2004); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 519 n.10 (6th Cir. 2001). In order to establish this claim, a plaintiff must prove the following four elements:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

8

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 321 (Ohio) (alteration in original) (quotation marks omitted), *cert. denied*, 522 U.S. 1008 (1997). Because Stephens cannot establish in the context of her ADEA claim that Kettering's legitimate, nondiscriminatory reason for discharging her was a pretext for discrimination, she also cannot satisfy the fourth element of the state claim. *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 375 (6th Cir. 1999); *Hausler v. Gen. Elec. Co.*, 134 F. App'x 890, 895 (6th Cir. 2005). Thus, we affirm the grant of summary judgment to Kettering on the state-law claim.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's order granting summary judgment to Kettering.